# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLUE MOUNTAIN ENERGY, INC., <br><br>     Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br>     Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:14-cv-418-DN <br><br> Judge David Nuffer |

Plaintiff, Blue Mountain Energy, Inc ("BME") disputes the amount of tax assessed by the Internal Revenue Service ("IRS") and seeks recovery of tax paid under protest. BME and Defendant, the United States of America ("Government"), filed cross-motions for summary judgment on July 27, 2015.[1] After reviewing the parties' memoranda, the undisputed facts and the relevant legal authorities, this Memorandum Decision and Order holds that the Constructive Sales Price Rule, under 26 U.S.C. 4216(b), does not apply, and the tax assessed stands.

BACKGROUND ........................................................................................................................ 2
UNDISPUTED MATERIAL FACTS ....................................................................................... 4
STANDARD OF REVIEW ........................................................................................................ 5
CONSTRUCTIVE SALES PRICE – 26 U.S.C. § 4216(b) ..................................................... 5
DISCUSSION ............................................................................................................................. 7
    A.     Based On The Plain Language Of The Statute, 26 U.S.C. § 4216(b)(1)(A) Applies Only To Arm's Length Sales ................................................................................ 7
    B.     The Treasury Regulations, as well as the IRS's interpretation of those regulations, are entitled to deference ........................................................................................ 10
        1.     Treas. Reg. §§ 42.4216(b)-1 and -2 are Entitled to *Chevron* Deference ... 11
        2.     The IRS's Interpretation of Treasury Regulations §§ 48.4216(b)-1 and -2 is Entitled to *Auer* Deference .................................................................... 16
    C.     Summary Judgment May Not Determine Whether BME is Subject to Accuracy-Related Penalties ............................................................................................... 19
ORDER ..................................................................................................................................... 22

---

[1] *See* United States' Motion for Summary Judgment ("Government's Motion"), docket no. 32, filed July 27, 2015; Motion for Summary Judgment and Memorandum in Support ("BME's Motion"), docket no. 35, filed July 27, 2015.

## BACKGROUND

BME contests the IRS's assessment of Black Lung Excise Taxes ("Excise Tax"). The Excise Tax "provides benefits to coal-mine workers disabled by lung diseases caused by exposure to coal dust."[2] The Excise Tax is assessed by tonnage of coal sold by the producer. BME is a producer.

The tax is imposed by 26 U.S.C. § 4121, which provides:

> (a) Tax imposed.--
> (1) In general.--There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b).
> (2) Limitation on tax.--The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.
> (b) Determination of rates and limitation on tax.--For purposes of subsection (a)--
> **(1)** the rate of tax on coal from underground mines shall be $1.10,
> **(2)** the rate of tax on coal from surface mines shall be $.55, and
> **(3)** the applicable percentage shall be 4.4 percent. [3]

The statute sets the Excise Tax at $1.10 per ton for underground coal, but the Excise Tax is capped at 4.4% of the "price at which such ton of coal is sold by the producer."[4] "Thus, coal from underground mines that sells for less than $25.00 per ton is taxed at a rate of 4.4 percent *ad valorem* instead of the flat rate of $1.10 per ton (4.4 percent of $25 equals $1.10)."[5]

BME is a wholly-owned subsidiary of Deseret Generation & Transmission Cooperative ("Deseret Power").[6] BME owns and operates the Deserado Coal Mine, an underground coal

---

[2] *Davis v. United States*, 972 F.2d 869, 869 (7th Cir. 1992).

[3] 26 U.S.C. § 4121.

[4] *Id.* § 4121(a).

[5] *Costain Coal, Inc. v. United States*, 36 Fed. Cl. 38, 39–40 (1996), *aff'd*, 126 F.3d 1437 (Fed. Cir. 1997).

[6] BME's Motion at viii, ¶ 7.

mine near Rangely, Colorado ("Deserado Mine").[7] Deseret Power owns and operates the

Bonanza Electric Generating Unit in Uintah County, Utah ("Bonanza Plant").[8] With the Bonanza

Plant, Deseret Power provides electric generation and transmission services to its members

primarily in rural areas of Utah and elsewhere.[9] Coal from the Deserado Mine is used

exclusively by Deseret Power in providing primary fuel for the Bonanza Plaint.[10]

     As a producer of coal, BME filed Quarterly Federal Excise Tax Returns (Form 720) for

each of the quarters at issue in this case. "After BME filed original excise tax returns BME was

subsequently audited by [the] IRS, and as a result of the audit findings by the IRS was assessed

additional amounts of Excise Tax for coal produced underground from the Deserado Mine for the

years 2008 through [2012] . . . ."[11] "The IRS claimed that the non-arm's length transfer amount

used between Deseret and BME represents the 'price at which [Deserado] coal is sold,' and that

such transfer amount is high enough that no limitation on the statutory $1.10 per ton Excise Tax

amount should apply."[12] "BME paid in full [on October 8, 2013], under protest, all amounts of

additional Excise Tax assessed by the IRS as a result of its disputed audit findings."[13] BME

eventually filed a protest and sought administrative appeals of the IRS' decision regarding tax

years 2008 through 2011, and tax year 2012.[14] After denial of its administrative protests and

appeals, BME filed the present lawsuit arguing that it is entitled to reimbursement for

overpayment of Excise Tax for the years 2008 through 2012 in the amount of $6,486,919.39,

---

[7] *Id*. ¶ 8.

[8] *Id*. ¶ 9.

[9] *Id*. ¶ 10.

[10] *Id*. at ix, ¶ 14.

[11] Corrected Amended Complaint at 3, docket no. 26, filed December 30, 2014.

[12] *Id*. at 5.

[13] *Id*. at 4.

[14] *Id*. at 6.

plus interest and penalty overpaid by BME in the amount of $1,296,124.60, totaling an overpayment of $7,783,043.99.[15]

This case presents a legal issue of statutory construction. What sales price should be used in calculating BME's excise tax? The Government contends that BME must use the actual price (capped at $25.00 per ton) for the coal. According to the Government, "[d]uring the quarters at issue in this case, the actual price that BME received for the coal it sold to Deseret ranged between $31.04 per ton and $55.77 per ton."[16] This would mean that BME owed tax at the rate of $1.10 per ton. BME, however, argues that its excise tax liability should be based on a lower constructive price determined by 26 U.S.C. § 4216.[17] That section provides, in specific circumstances, for use of constructive prices for tax calculation rather than actual prices. The Government maintains that none of the circumstances which allow use of a constructive price are present and that the actual sales price of the BME–Deseret transactions should be used for tax calculation.

## UNDISPUTED MATERIAL FACTS

1.    The sales of coal from BME to Deseret are non-arm's length transactions, as BME is a wholly owned subsidiary of Deseret.[18]

2.    The coal sold by BME to Deseret was sold at a price greater than fair market value.[19]

---

[15] *Id*. at 9.

[16] Government's Motion at 4.

[17] *See* BME's Motion at 1–5; *see also* Memorandum in Opposition to Defendant's Motion for Summary Judgment at ii–iv ("BME's Opposition"), docket no. 46, filed September 11, 2015.

[18] Government's Motion at 8, ¶ 22.

[19] *Id*. ¶ 23.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] When analyzing a motion for summary judgment, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[21] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[22] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[23] "The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard."[24]

## CONSTRUCTIVE SALES PRICE – 26 U.S.C. § 4216(b)

The rules for assessment of the tax in question are complex. The stated sales price is a starting consideration but does not always determine the basis of calculation of the tax. "The basic sale price rules assumes that the manufacturer sells the article in an arm's length transaction (that is, in a transaction between two unrelated parties) to a wholesale distributor that then sells it to a retailer that resells to consumers."[25]

> Congress early recognized, however, that competitive inequities were created among manufacturers of like goods who sold at different levels of distribution. E.g., a manufacturer which sold at retail rather than to wholesalers charged a

---

[20] Fed. R. Civ. P. 56(a).

[21] *Mathews v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1204 (10th Cir. 2011) (citation and internal quotations omitted).

[22] *Ford v. Pryor,* 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[23] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[24] *Ditty v. CheckRite, Ltd., Inc.,* 973 F. Supp. 1320, 1326 (D. Utah 1997) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993)).

[25] Bill Conlon, *Memorandum for Excise Field Operations* (July 7, 2006), https://www.irs.gov/businesses/small-businesses-self-employed/field-directive-federal-excise-tax-on-the-importation-and-manufacture-of-fishing-and-archery-products (last visited August 4, 2016).

higher price for its goods because of increased expenses of distribution at retail. Thus the excise tax paid [by the retail seller] was accordingly higher [than the tax paid by a wholesale seller], in effect penalizing the manufacturer for its method of distribution.[26]

Thus, one of Congress's intentions for the constructive price provision was to not "tax manufacturers on the sales price of the goods sold at retail, but rather to erect an artificial 'constructive sale price' more nearly approximating the manufacturer's ordinary sales price, and to compute the tax on the latter price."[27] Moreover, "[b]y permitting the Internal Revenue Service to impose a constructive price, Congress sought to prevent taxpayers from reducing their excise tax liability by charging artificially low prices to related buyers who then, without excise tax liability, might obtain the market price from independent buyers."[28]

The relevant language of the constructive sales price provision under § 4216(b)(1) reads:

(b) Constructive sale price.--
    (1) In general.--If an article is--
        (A) sold at retail,
        (B) sold on consignment, or
        (C) sold (otherwise than through an arm's length transaction) at less than the fair market price,
the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. In the case of an article sold at retail, the computation under the preceding sentence shall be on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. This paragraph shall not apply if paragraph (2) applies.[29]

---

[26] *Shakespeare Co. v. United States*, 419 F.2d 839, 841 (Ct. Cl. 1969); *see also Strick Corp. v. United States*, 714 F.2d 1194, 1198 (3d Cir. 1983) ("Because the excise tax is ordinarily levied against the wholesale selling price, a constructive price was needed for manufacturers selling at retail so that the tax burden on these manufacturers would approximate the norm.").

[27] *Cont'l Truck Indus., Inc. v. United States*, 343 F. Supp. 408, 411 (E.D.N.Y. 1972); *see also Strick Corp.*, 714 F.2d at 1198) ("The legislative history of the constructive sales price provision reflects an origin and purpose to create an artificial wholesale selling price for manufacturers who sold only at retail.").

[28] *Creme Mfg. Co. v. United States*, 492 F.2d 515, 519 (5th Cir. 1974).

[29] 26 U.S.C. § 4216(b)(1).

This subsection of the statute provides the groundwork for use of a constructive sale price on which tax would be computed.

The parties' dispute centers on whether the coal BME sold to Deseret was "sold at retail" under § 4216(b)(1)(A). If the coal sold by BME was not "sold at retail" under § 4216(b)(1)(A), then the constructive price rule does not apply, and the IRS was correct in assessing BME's excise tax on the actual price of coal used in the BME – Deseret sales. However, if the provision does apply, then the IRS must use a constructive sales price to compute BME's excise tax for the tax years 2008 through 2012.[30]

## DISCUSSION

### A. Based On The Plain Language Of The Statute, 26 U.S.C. § 4216(b)(1)(A) Applies Only To Arm's Length Sales

It is axiomatic that the starting point in statutory interpretation is the language of the statute itself. When interpreting a statute, it is assumed "that Congress's intent is expressed correctly in the ordinary meaning of the words it employs."[31] "[A]bsent ambiguity or irrational result, the literal language of a statute controls."[32]

The plain language of § 4216(b)(1)(A)—"sold at retail"—is not ambiguous. Section 4216(b)(1) states: "In general.--If an article is--(A) sold at retail, (B) sold on consignment, or (C) Sold (otherwise than through an arm's length transaction) at less than the fair market price . . . ."[33]

---

[30] BME has withdrawn its claims for a refund for the third quarter of 2011 through the fourth quarter of 2012. *See* Order, docket no. 42, filed September 10, 2015.

[31] *St. Charles Inv. Co. v. C.I.R.*, 232 F.3d 773, 776 (10th Cir. 2000).

[32] *id.* (quoting *Edwards v. Valdez,* 789 F.2d 1477, 1481 (10th Cir. 1986)).

[33] 26 U.S.C § 4216(b)(1)(A)-(C).

The noun 'retail' in general usage means: "The sale of goods or commodities to ultimate consumer, as opposed to the sale for further distribution or processing."[34] Consignment (under § 4216(b)(1)(B)) is consistent. Retail and consignment are both arm's length transactions. At retail, anyone can buy. Retail sales occur in an open market. Consignment is the same. In these open market circumstances, the statute gives the benefit of a constructive price to eliminate differential tax treatment of wholesalers and retailers.

Section 4216(b)(1)(C) treats a very different subject, and was adopted for a different purpose, but has the same result. If a product is "sold (otherwise than through an arm's length transaction) at less than the fair market price" the seller is likely trying to structure the transaction for tax avoidance purposes—and in that instance the constructive price is imposed to prevent tax avoidance. There is, by contrast, no tax avoidance purpose in subsections (A) and (B), because those are market set prices, at arm's length.

The textual construction of § 4216(b)(1) given above makes practical sense. In a retail or consignment transaction, the constructive sales price allows a special consideration to reflect the existence of parallel and competitive wholesale markets. The effect is to give producers the benefit of the *lower* price. Similarly, in a non-arm's length transaction set below market value for some unspecified reason, the wholesale price is used as a constructive sales price, to prevent artificially low prices.

But if, as here, parties in a closed, non-arm's length transaction specify an above market price, for some unspecified reason, § 4216(b)(1) does not apply and the parties are bound by their agreed transaction price. In a closed, non-arm's length transaction at an above market price, there is no suggestion of setting a low price for tax advantage as under § 4216(b)(1)(C).

---

[34] RETAIL, Black's Law Dictionary (10th ed. 2014).

The reason to allow a retail or consignment seller in the general market the use of the constructive sales price to maintain comparability with wholesale prices also does not exist.

The structure of § 4216(b)(1) affirms the contrast between the sales at arm's length in subsection (A) and (B) and those private non-arm's length sales in subsection (C). Subsection (C) uses the word "otherwise" to make it clear that subsection (C) applies in a circumstance not found in subsections (A) and (B). The sales under subsection (C) are "*otherwise* than through an arm's length transaction," while sales under subsections (A) and (B) are at arm's length. Transactions governed by subsection (C) are not market price sales, but those governed by subsections (A) and (B) are market sales.

The language of the special rule in § 4216(b)(2) does not conflict with this construction of § 4216(b)(1). Section 4216(b)(2) reads:

> (2) Special rule.—If an article is sold at retail or to a retailer, and if—
> (A) the manufacturer, producer, or importer of such article regularly sells such articles at retail or to retailers, as the case may be,
> (B) the manufacturer, producer, or importer of such article regularly sells such articles to one or more wholesale distributors in arm's length transactions and he establishes that his prices in such cases are determined without regard to any tax benefit under this paragraph, and
> (C) the transaction is an arm's length transaction,
> The tax under this chapter shall (if based on the price for which the article is sold) be computed on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold by such manufacturer, producer, or importer to wholesale distributors (other than special dealers).[35]

The express wording of § 4216(b)(2) demonstrates that this special rule applies only where the same manufacturer, producer, or importer sells the articles at retail *and also* regularly sales to wholesale distributors. The drafters made clear that these transactions must be at arm's length for the subsection to apply. The use of the "arm's length transaction" language in

---

[35] 26 U.S.C. § 4216(b)(2).

§ 4216(b)(2) is in a separate section, with a distinct purpose and stands independent of the clear meaning of § 4216(b)(1).

**B. The Treasury Regulations, as well as the IRS's interpretation of those regulations, are entitled to deference**

The first part of this order concluded the statute is clear, but assuming the constructive sales price rule was silent and Congress's intent was ambiguous on the present issue, *Chevron* and *Auer* deference provide the standard of review on BME's remaining arguments.

BME asks that the Government's argument—that Treas. Reg. § 48.4216(b)-1 and -2 limit "sold at retail" to arm's length transactions—be rejected for two reasons. First, had the IRS "intended Treas. Reg. §§ 48.4216(b)-1 and -2 to limit application of Section 4216(b)(1)(A) to arm's length retail sales, the regulations would be based on an impermissible construction of the statute that is different from the intent of Congress and, therefore, must fail under *Chevron*."[36]And second, the Government "interprets Treas. Reg. §§ 48.4216(b)-1 and -2 too narrowly—those regulations do not limit application of Section 4216(b)(1)(A) to arm's length retail sales."[37] Because BME challenges the regulation and the interpretation of the regulation, two layers of deference apply to BME's arguments.

The United States Supreme Court has defined various levels of deference to administrative agencies, the application of which depends on "the interpretive method used and the nature of the question at issue."[38] "When Congress has entrusted rulemaking authority under a statute to an administrative agency, we evaluate the agency's implementing regulations under

---

[36] BME's Opposition at 2.

[37] *Id*.

[38] *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*"[39] "A similar deference applies when an agency interprets its own regulations. That interpretation, regardless of the formality of the procedures used to formulate it, is 'controlling unless plainly erroneous or inconsistent with the regulation[s].'"[40] The latter deference is *Auer* deference.[41]

### 1. Treas. Reg. §§ 42.4216(b)-1 and -2 are Entitled to *Chevron* Deference

Treasury Regulations §§ 48.4216(b)-1 and -2 were authorized by the Treasury's general rulemaking authority under 26 U.S.C.A. § 7805(a) and were published in final form on April 23, 1979, after undergoing a normal notice and comment period.[42] Thus, the regulations are entitled to full deference under *Chevron*.[43] *Chevron* instructs that if the statutory language is clear and unambiguous, the court's inquiry ends and the plan meaning of the statute controls.[44] However, if the statutory provision is silent or ambiguous, the court must determine whether the agency's interpretation in Treasury Regulations §§ 42.4216(b)-1 and -2 "is based on a permissible construction of the statute."[45] "The court need not conclude the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."[46] "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the

---

[39] *Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 78 (2d Cir. 2009)(citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)).

[40] *Id.* (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997) (internal quotation marks omitted)).

[41] *Auer,* 519 U.S. 452.

[42] *See* T.D. 7613, 44 F.R. 23823 (April 23, 1979).

[43] *See United States v. Mead Corp.,* 533 U.S. 218, 226–31 (2001).

[44] *Chevron*, 467 U.S. at 843.

[45] *Id.*

[46] *Id.* at 843 n. 11.

agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."[47]

Thus, assuming the statutory language is ambiguous under step one of *Chevron*, the second step of *Chevron* requires a determination of whether the Government's regulatory definition of "sold at retail" is "based on a permissible construction of the statute."[48] An agency interpretation is permissible where it is not "arbitrary, capricious, or manifestly contrary to the statute."[49]

Acting pursuant to its authority,[50] the Commissioner of the Internal Revenue ("Commissioner") promulgated Treas. Reg. §§ 4216(b)-1 and -2.[51]

Treasury Regulation § 42.4216(b)-1 states in relevant part:

> **(a) In general.** Section 4216(b) pertains to those taxes imposed under Chapter 32 that are based on the price for which an article is sold, and contains the provisions for constructing a tax *base other than the actual sale price of the article, under certain defined conditions.*
> **(b) Specific applications. (1)** Section 4216(b)(1) applies to:
>> (i) *Arm's-length sales at retail or on consignment*, other than those sales at retail and to retailers to which section 4216(b)(2) and § 48.4216(b)-3 applies; and
>> (ii) Sales otherwise than at arm's length, and at less than fair market price.[52]

Treasury Regulation § 42.4216(b)-2 states in relevant part:

---

[47] *Nat'l Cable & Telecomms. Ass'n v. Brand X,* 545 U.S. 967, 980 (2005).

[48] *Chevron,* 467 U.S. at 843.

[49] *Id.*

[50] *See Comm'r v. Engle,* 464 U.S. 206, 226–27 (1984) (recognizing that 26 U.S.C. § 7805 delegates to the Commissioner the authority to prescribe all "needful rules and regulations" for the enforcement of the Code); *Mayo Found. for Med. Educ. & Research v. United States,* 562 U.S. 44, 56 (2011) (concluding the Treasury Department has the power to fill any gaps in the Code left by Congress).

[51] 26 CFR §§ 4216(b)-1 and -2.

[52] 26 C.F.R. § 48.4216(b)-1 (emphasis added).

(b) **Sales at retail.** Section 4216(b)(1)(A) relates to the determination of a constructive sale price for sales of taxable articles *sold at arm's length and at retail.*[53]

BME contends that "if the [Treasury] regulations *had* defined 'sold at retail' as being limited to arm's length transactions, such a definition must be rejected because defining 'sold at retail' to mean 'sold at retail in arm's length transactions' is not an ordinary use of the term 'sold at retail.'"[54] According to BME, "courts interpreting the term 'retail' or 'retail sale' have defined it to mean the sale to an ultimate consumer or sold not for resale, without applying any limitation based on the relationship between the buyer and seller.[55] Thus, "[a]ny definition of the term 'sold at retail' that defines that term as being limited to arm's length transactions 'runs contrary to the common meaning of that term' and is, therefore, arbitrary and capricious and must be rejected."[56]

BME's argument is without merit. As discussed in section A above, retail sales occur in an open market where anyone can buy. This is an arm's length transaction as defined by Treas. Reg. §§ 4216(b)-1 and -2. The cases cited by BME do not affect this determination. In *Roland Electrical Co. v. Walling,*[57] the United States Supreme Court determined whether an electrical engineering company that sold motors which were not purchased for resale was exempt from the operation of the Fair Labor Standards Act as a retail or service establishment. The Court made a thorough inquiry into the general usage of the word "retail" and found that retail denoted sales in small quantities to ultimate consumers for personal or household use. The Court concluded the commercial and industrial concerns to whom Roland sold could not legitimately be considered

---

[53] 26 C.F.R. § 48.4216(b)-2 (emphasis added).

[54] BME's Opposition at 13.

[55] *Id.* at 14.

[56] *Id.*

[57] 326 U.S. 657 (1946).

'retail customers'. In *Gellman Bros. v. United States*,[58] the court, defining "sold at retail" for the purposes of a retail excise tax, held that a retail sale is a sale to the ultimate consumer for personal consumption and without a further profitable motive. The Court of Claims in *Worrell's, Ltd. v. United States*,[59] rejected *Gellman's* definition and instead defined "sold at retail" as sale which is made for a purpose other than resale by the purchaser.

These cases do not discuss whether "sold at retail" encompasses non-arm's length transactions. In fact, all of these cases actually involve sales at arms-length. Also, the cases clarify retail versus wholesale transactions in terms of the buyer's use but do not discuss the relationship of the buyer and seller. Here, Deseret was the ultimate user of the coal making the regulation applicable to the sale.

BME also contends that the Treasury Regulations are inconsistent with the Congressional history and public policy underlying § 4216(b).[60] BME states that Congress's intention as to the meaning of retail sales is "shown through reviewing the two 1958 'retail sales' amendments in tandem."[61] "The 1958 Act amended Section 4216(b)(1) to include the current language stating that '[i]n the event of an article sold at retail, the computation [for the Excise Tax] shall be on whichever of the following prices is lower . . . ."[62] "The 1958 Act also added the 'special rule' found in current Section 4216(b)(2)[,]" which was discussed *supra* in section A. Based on these amendments, BME argues that if "Congress intended the term 'retail sales' to naturally be limited in every instance where it appears in the statute to only arm's length transactions, then

---

[58] 235 F.2d 87 (8th Cir. 1956).

[59] 301 F.2d 317 (1962).

[60] BME's Opposition at 14.

[61] *Id.* at 16.

[62] *Id.* at 15 (quoting Excise Tax Technical Changes Act of 1958, Exhibit 2, docket no. 46-2, filed September 11, 2015).

Congress's express language in Section 4216(b)(2) specifically limiting the application of that section to retail sales in arm's length transactions is unnecessary and redundant."[63] And BME states that when both 1958 amendments are read in tandem, "[i]n one amendment (to Section 4216(b)(2)) Congress expressly limited application of the statute to articles sold "in arm's length transactions," while in the other amendment (to Section 4216(b)(1)(A)) Congress could have included the same limitation, but chose not to do so."[64]

BME is incorrect. The Government's interpretation is consistent with legislative history. Congress was concerned, among other things, about the tax burden inequities created when a producer sold at higher retail prices rather than wholesale prices. As discussed above, and as the Government aptly explains the concern of higher retail prices "is only present in an arm's length retail transaction. Producers in non-arm's length transactions (such as BME) would normally be expected to use a lower, wholesale price rather than a higher retail price for the sale of their products."[65] Furthermore, as stated previously, the language of the special rule in § 4216(b)(2) does not conflict with this construction of § 4216(b)(1), as the special rule is in a separate section, with a distinct purpose and stands independent of the clear meaning of § 4216(b)(1).

In sum, based on the legislative history and policy considerations, Treasury Regulations § 48.4216(b)-1 and -2 represent a permissible construction of the statute and are not "arbitrary, capricious, or manifestly contrary to the statute."[66]

---

[63] BME's Opposition at 15–16.

[64] *Id*. at 16.

[65] Government's Motion at 17 (internal citation omitted).

[66] *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148 (10th Cir. 2013).

## 2. The IRS's Interpretation of Treasury Regulations §§ 48.4216(b)-1 and -2 is Entitled to *Auer* Deference

BME argues that the Government's "assertion that Treas. Reg. §§ 4216(b)-1 and -2 limit application of Section 4216(b)(1)(A) to articles sold at retail *and in arm's length transactions* is overly constricted."[67] According to BME, "the IRS itself has already rejected the Government's proposed litigation position, and has issued an IRS Revenue Ruling which is directly applicable to this case, concluding that Section 4216(b)(1)(A) applies to *all* retail sales, including non arm's length retail sales."[68] BME's argument is without merit. The Government position in this case is similar to the IRS position during the administrative process, prior to litigation of this case.[69] Therefore, the position taken by the Government now is the IRS's interpretation of the regulations.

When an agency interprets its own regulation in deciding whether a party was in compliance, the *Auer* deference, recognized in *Auer v. Robbins,*[70] applies. *Auer* deference is fairly similar to *Chevron* deference in that a court must begin by examining the plain language of the regulatory text.[71] If the regulation is ambiguous, then *Auer* requires the court to "defer to the Commissioner's reasonable interpretations, even those advanced in his legal brief, unless 'plainly erroneous or inconsistent with the regulation[ ]' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'"[72]

---

[67] BME's Opposition at 3.

[68] *Id*.

[69] *See* IRS Examination Report, docket no. 37-2, filed July 27, 2015.

[70] 519 U.S. 452 (1997).

[71] *Mitchell v. C.I.R.*, 775 F.3d 1243, 1249 (2015).

[72] *Id*.

BME contends that the Government interprets the Treasury Regulations too narrowly.[73] It argues that "[b]oth regulations use language of inclusion, stating that Section 4216(b)(1)(A) 'applies to' or 'relates to' articles 'sold at retail' in arm's length transactions. Neither regulation states that Section 4216(b)(1)(A) 'applies *only* to' or 'relates *only* to' arm's length retail sales."[74] BME's argument is foreclosed by the plain language of the regulations. Contrary to BME's argument, the regulatory language clearly confines "sales at retail" to arm's length transactions. For example, § 48.4216(b)-1(b)(1) states that "Section 4216(b)(1) applies to: (i) *Arm's-length sales at retail* or on consignment, . . . and (ii) Sales otherwise than at arm's length, and at less than fair market price." Not even a strained reading of the quoted language could include "non-arm's length sales." The same holds true for § 48.4216(b)-2. Further, each regulation contains a separate treatment of non-arms-length transactions, clearly distinguishing those from retail and consignment sales.

Even if the regulations were viewed as ambiguous with respect to the term "sales at retail," the IRS interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulations" or "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question." "This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a 'convenient litigating position,' or a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack."[75]

---

[73] BME's Opposition at 3.

[74] *Id.*

[75] *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166–67 (2012) (internal quotation marks and citations omitted).

The IRS's interpretation—that "sales at retail" is limited to arm's length transactions—is not plainly erroneous or inconsistent with the constructive sales price rule. Furthermore, there is no reason to suspect that the agency's interpretation does not reflect its fair and considered judgment on the matter in question. BME cites to Revenue Ruling 81-188 to demonstrate that the IRS's current interpretation conflicts with its prior interpretation in Revenue Ruling 81-188, and therefore does not reflect its fair and considered judgment.. [76]

BME asserts that "[o]nly two years after passing Treas. Reg. §§ 4216(b)-1 and -2, the IRS issued Revenue Ruling 81-188, expressly finding that Section 4216(b)(1)(A) does, in fact, apply to retail sales in non arm's length transactions." [77] And Rev. Rul. 81-188 establishes "a hierarchy between Sections 4216(b)(1)(A) and 4216(b)(1)(C)[.]" [78] Rev. Rul. 81-188 states that "[w]hen a sale is described in section 4216(b)(1)(A) and section 4216(b)(1)(C) of the Code, section 4216(b)(1)(C) controls over section 4216(b)(1)(A). This position reflects the purpose of section 4216(b)(1)(C), which is to prevent a manufacturer that sells an article in a non-arm's length transaction from having an artificially low price used as a tax base for the sale." [79]

Although revenue rulings are entitled to consideration, they "do not have the same force and effect as treasury regulations and are not binding on this court." [80] Rather, revenue rulings are typically the IRS's response to a hypothetical situation. [81] Courts must be cautious not to extend the scope of a revenue ruling beyond the hypothetical situation presented. [82] Rev. Rul. 81-188 is

---

[76] BME's Opposition at 4–6.

[77] *Id*. at 17.

[78] *Id*. at 20.

[79] Rev. Rul. 81-188 at * 2.

[80] *True Oil Co. v. C.I.R.,* 170 F.3d 1294, 1304 (10th Cir. 1999).

[81] *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998).

[82] *Babin v. C.I.R.,* 23 F.3d 1032, 1038 (6th Cir. 1994) ("However, we need not accord a revenue ruling any deference, where, as here, the revenue ruling fails to address the relevant issue on appeal.").

"directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling."[83]

As the Government appropriately explains, the facts and the statute (26 U.S.C.A. § 4061, now repealed) on which Rev. Ruling 81-188 is based are different from those involved in the present case. "Revenue Ruling 81-188 is based on a scenario in which a wholly owned subsidiary buys the items in question not only from its parent corporation, but also buys identical items from other manufacturers at the same price."[84] Unlike the present case where "the coal produced by BME is sold only to its parent, Deseret Power, and Deseret Power buys only from the subsidiary."[85] Accordingly, Rev. Rul. 81-188 does not bind the IRS or affect the analysis above, nor present any reason to suspect that the agency's interpretation of Treas. Reg. §§ 48.4216(b)-1 and -2 does not reflect the fair and considered judgment on the matter in question.

### C. Summary Judgment May Not Determine Whether BME is Subject to Accuracy-Related Penalties

The Government contends that a 20% accuracy-related penalty should be imposed pursuant to 26 U.S.C. § 6662 for BME's negligence or disregard of rules and regulations. Section 6662(a) imposes a 20% tax on the portion of an underpayment of tax—required to be shown on a return—attributable to, among other things, negligence or disregard of rules or regulations.[86]

BME argues that it "is not subject to the accuracy-related penalties imposed by the IRS for at least two reasons."[87] First, BME states that it did not underpay its Excise Tax based on the

---

[83] Treas. Reg. § 601.601(d)(2)(v)(a)); 26 C.F.R. § 601.601.

[84] United States' Reply to Response to Motion for Summary Judgment ("Government's Reply) at 2, docket no. 48, filed September 28, 2015.

[85] *Id*.

[86] 26 U.S.C. § 6662(a).

[87] BME's Opposition at 22.

constructive price rule.[88] This argument fails in light of the decision above that the constructive price rule does not apply in the present circumstance. Second, BME asserts that it was not negligent nor did it disregard rules and regulations because it had a reasonable basis for the position it took.[89]

A taxpayer is not liable for a negligence penalty where there is a reasonable basis for the position taken.[90] Treas. Reg. § 1.6662-3(b)(3) define "reasonable basis" as follows:

> Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. If a return position is reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2).[91]

BME contends that "[t]he 'fair market value' of Deserado coal utilized on BME's initial tax return and amended tax returns all were based on the belief—reasonably reached based on Section 4216(b)(1)(A) and Revenue Ruling 81-188—that the constructive price rules applies to BME's Excise Tax obligation."[92] BME concludes that "[b]ecause BME relied on 'one or more of the authorities' in Treas. Reg. § 1.6662-4(d)(3)(iii), it has a 'reasonable basis' for its return position and was not negligent."[93] Similarly, BME contends that it did not "carelessly,

---

[88] *Id.*

[89] *Id.* at 23.

[90] Treas. Reg. § 1.6662-3(b)(1).

[91] *Id.*

[92] BME's Opposition at 24.

[93] *Id.*

recklessly, or intentionally disregard[ ] rules or regulations[,]" because "it took a position that the IRS itself took in Revenue Ruling 81-188."[94]

In reply, the Government states that "[e]ven if Rev. Rul 81-188 could be read as broadly as BME asserts, BME submits no evidence that anyone at BME was aware of the existence of that revenue ruling at the time the decision was made to ignore the clear language of the regulations and use an artificial price rather than the actual retail price when computing BLET."[95] According to the Government, "[t]his failure leads to the obvious conclusion that BME did not rely on that ruling, but rather consciously chose to ignore applicable guidance."[96]

BME's return position is based on one of the authorities—*i.e.* a revenue ruling—set forth in § 1.6662-4(d)(3)(iii). Although the facts and the statute on which Rev. Ruling 81-188 is based are different from those involved in the present case, the Rev. Ruling does analyze the constructive price rule and could provide a reasonable basis for BME's position. There remains, however, an issue of fact whether BME was aware and relied on Revenue Ruling 81-188 when it filed its tax returns during the relevant times at issue. Accordingly, summary judgment on this issue is denied.

---

[94] *Id.* at 24-25.

[95] Government's Reply at 9.

[96] *Id.* at 910.

**ORDER**

It is THEREFORE ORDERED that the Government's Motion[97] for Summary Judgment is GRANTED in part and DENIED in part, and BME's Motion[98] for Summary Judgment is DENIED. IT IS FURTHER ORDERD that because the actual retail price is to be used, the remaining pending motions[99] are MOOT.

Dated August 5, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[97] Docket no. 32.

[98] Docket no. 35.

[99] *See* United States' Motion in Limine to Exclude Expert Testimony of Robert R. Dalley, docket no. 33, filed July 27, 2015; United States' Motion in Limine to Partially Exclude Expert Testimony of Patrick G. Akers, docket no. 34, filed July 27, 2015; Motion to Exclude Testimony of IRS Expert Emily S. Medine and Memorandum in Support, docket no. 36, filed July 27, 2016.